**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

PAUL R. WALLACE
JUDGE*

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 10400
WILMINGTON, DELAWARE 19801
(302) 255-0660

Submitted:  March 6, 2024
Decided:   May 17, 2024

Kevin M. Coen, Esquire
Miranda N. Gilbert, Esquire.
MORRIS, NICHOLS, ARSHT & TUNNELL
1201 North Market Street
Wilmington, Delaware 19801

Joseph P. Rockers, Esquire
Justin D. Ward, Esquire.
GOODWIN PROCTER
100 Northern Avenue
Boston, Massachusetts 02210

Shannon E. German, Esquire
Jeremy W. Gagas, Esquire
Emmanuel J. Burrell, Esquire
WILSON SONSINI GOODRICH & ROSATI
222 Delaware Avenue
Wilmington, Delaware 19801

RE: *Aldrich Capital Partners Fund, LP, et al. v. Rhonda Bray*
C.A. No. 2023-1253-PRW
Defendant's Motion to Dismiss

Dear Counsel:

The Court provides this Letter Opinion and Order in lieu of a more formal writing[1] to resolve the Motion to Dismiss filed by Rhonda Bray.  For the reasons explained below, the Motion is **DENIED**.

---

\* Sitting by designation of the Chief Justice pursuant to *In re Designation of Actions Filed Pursuant to 8 Del. C. § 111* (Del. Sept. 18, 2023) (ORDER).

[1]  The Court crafts this somewhat abbreviated decision keeping in mind the parties' full understanding of and familiarity with the factual background and operative agreements mentioned herein.

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. THE SPA AND THE MURJ LITIGATION

Defendant Rhonda Bray is an entrepreneur and the founder of Plaintiff Rhythm Management Group Corp.[3] Rhythm is a technology-driven healthcare business that helps patients and providers by enabling the remote monitoring of implantable cardiac devices, among other things.[4] Rhythm employs a proprietary software platform called "Synergy" to facilitate the remote medical monitoring.[5]

In December 2020, Plaintiff Aldrich Capital Partners Fund, LP expressed its interest in investing in Rhythm.[6] Bray was receptive, so the parties engaged in due diligence.[7] And, on May 14, 2021, they executed a Stock Purchase Agreement (the "SPA").[8] But even as they signed the dotted line, trouble was on the horizon.

While Aldrich was planning an investment in Rhythm, non-party Murj Inc. was planning a lawsuit against Rhythm. Murj is a software company that produces

---

[2] The following facts are derived from the allegations in the Complaint and the exhibits attached thereto. They are presumed to be true solely for purposes of this Motion.

[3] Compl. ¶ 15 (D.I 1).

[4] *Id.*

[5] *Id.*

[6] *Id.* ¶ 18.

[7] *Id.*

[8] *Id.* ¶ 28.

the "Murj Platform."[9]    Before it created Synergy, Rhythm[10] utilized the Murj

Platform under the auspices of the "Murj License Agreements."[11]  The terms of the

Murj License Agreements prohibited Rhythm from copying or reverse-engineering

the Murj Platform.[12]  So Murj wasn't happy when it found out that Rhythm built

Synergy to do the same things the Murj Platform did.[13]  Murj voiced its displeasure

via a lawsuit filed in January 2021; it alleged Rhythm stole Murj's intellectual

property in breach of the Murj License Agreements (the "Murj Litigation").[14]

Aldrich was alerted to the Murj Litigation during due diligence.[15]  But, instead

of walking away from the deal, Aldrich chose to bargain for contractual

protections.[16]   Those protections took the form of representations and special

indemnity provisions—and those are now the focus of this litigation.

---

[9]  *Id.* ¶ 19.

[10]  Rhythm operates through its subsidiary, Rhythm Management Group, LLC f/k/a Rhythm Management Group, PLLC ("RMG LLC").  *Id.* ¶ 15.  RMG LLC was the signatory to the Murj License Agreements.  *Id.* ¶ 20.  The distinction between Rhythm and RMG LLC is insubstantial for present purposes because the allegedly breached representations applied equally to both.  That being so, this Letter Opinion will follow the parties' lead and temporarily elevate simplicity over exactness by referring only to Rhythm.

[11]  *Id.* ¶ 20.

[12]  *Id.*

[13]  *Id.* ¶ 21.

[14]  *Id.* ¶¶ 4, 21.

[15]  *Id.* ¶ 23.

[16]  *Id.*

As for the relevant representations, SPA § 4.16(a) provides:

> The Group Companies [*i.e.*, Rhythm and its subsidiaries] own all right, title and interest in and to (free and clear of any Liens other than Permitted Liens), or have valid and enforceable licenses to use, all Intellectual Property used or held for use in or necessary to the conduct of their respective businesses as currently conducted. Each Group Company has been and is in material compliance with all contractual obligations relating to the Intellectual Property it uses or holds for use pursuant to license or other agreement.[17]

SPA § 4.16(b) states in pertinent part:

> Neither the conduct of the business of the Group Companies, nor any of the Group Companies or the Proprietary Software or any Company Product, nor any use, sale, offer to sell, licensing, provision, importation or exportation thereof or any other activities conducted by the Group Companies associated therewith, conflict with, infringe, misappropriate or violate, nor in the past six years have conflicted with, infringed, misappropriated, or otherwise violated, any Intellectual Property of any third party. Except as set forth on Schedule 4.16(b), there is no written notice or Proceeding pending or, to the Knowledge of the Company, threatened in writing against any Group Company (i) alleging any such conflict with, or infringement, misappropriation or violation of any third party's Intellectual Property, including any offer or request to license any Intellectual Property, or (ii) challenging such Group Company's ownership or use, or the validity or enforceability, of any Intellectual Property owned or purported to be owned by a Group Company.[18]

And SPA § 4.25 provides in pertinent part:

> Each Material Contract [including the Murj License Agreements]: . . . (ii) is in full force and effect on the date hereof and the applicable Group

---

[17]  Bray's Mot., Ex. 1 (hereinafter "SPA") § 4.16(a).

[18]  *Id.* § 4.16(b).

Company is not in default or material breach of any Material Contract, and no event or circumstance has occurred which, with due notice or lapse of time or both, would constitute such a default or material breach[.][19]

The SPA's representations were not unqualified, however. Rhythm's representations in the SPA come with the global caveat, "[e]xcept as qualified by the Disclosure Schedules."[20] And the relevant Disclosure Schedule ("Disclosure Schedule" or "DS") disclosed the Murj Litigation, explaining: "Murj, Inc. filed a complaint against the Company on January 6, 2021, in the U.S. Federal District Court in San Jose, California alleging the Company breached its License Agreement with Murj and misappropriated Murj intellectual property (the 'Murj Litigation')."[21] Likewise, DS § 4.18 lists "The Murj Litigation" under the heading "Litigation."[22]

Regarding the scope of the Disclosure Schedule's disclosures, SPA § 8.18 explains:

The disclosures in the Disclosure Schedules are to be taken as relating to the representations and warranties of the Company and the Seller set forth in the corresponding section of this Agreement and in each other section of this Agreement (to the extent the applicability of such disclosure is readily apparent on its face . . .), notwithstanding the fact that the Disclosure Schedules are arranged by sections corresponding

---

[19] *Id.* § 4.25.

[20] *Id.* at Art. IV.

[21] Bray's Mot., Ex. 2 (hereinafter "DS") § 4.16(b).

[22] *Id.* § 4.18.

to the sections in this Agreement or that a particular section of this Agreement makes reference to a specific section of the Disclosure Schedules.[23]

The Disclosure Schedule itself, however, offers a different explanation of how broadly each disclosure is meant to apply, saying:

> The section numbers below correspond to the section numbers of the representations and warranties in the Agreement; provided, however, that any information disclosed herein under any section number shall be deemed to be disclosed and incorporated into any other section number under the Agreement if specified under such other section number.[24]

Apart from those representations, the parties also agreed to Murj-specific indemnity provisions. SPA § 6.3(v) explains that Aldrich has the right to be indemnified for losses resulting from "the Murj Litigation."[25] SPA § 6.10(g) provides in pertinent part that the Murj-related losses:

> shall be first satisfied from: (i) the [$500,000] Special Indemnity Escrow Amount . . . (ii) for any Losses after the Special Indemnity Escrow Amount has been exhausted, up to $1,000,000 directly from the Company, (iii) thereafter, any further Losses to be shared equally by the Seller and the Company[.][26]

And SPA § 6.9(b)(ii)(B) states in pertinent part that Bray's indemnity obligations

---

[23] SPA § 8.18.

[24] DS at 1.

[25] SPA § 6.3(v).

[26] *Id.* § 6.10(g).

for the Murj Litigation are capped at the "Secondary Consideration," which is the $11 million Bray received under the SPA.[27]

## B. REVELATION OF THE ALLEGED FRAUD

To Aldrich, the disclosure of the Murj Litigation in concert with the representations about Rhythm's valid IP ownership implied that the Murj Litigation was meritless.[28] But when Aldrich saw the Murj Litigation discovery in April 2023, Murj's case didn't look so bad.

For example, communications from 2018 reveal that Rhythm hired a developer to build a product with "the same features and functionality as the Murj software platform [Rhythm] is currently using."[29] And Bray was part of conversations describing conscious efforts to keep Murj in the dark about Rhythm's use of the Murj Platform as a template.[30] Such efforts included Rhythm employees showing the Murj Platform to the overseas software developer via screenshare so that Murj wouldn't notice a foreign login attempt.[31]

Accordingly, Aldrich alleges that Bray knew at the time of contracting that:

---

[27] *Id.* §§ 2.1(b), 6.9(b)(ii)(B).

[28] Compl. ¶ 27.

[29] *Id.* ¶¶ 35-36 (emphasis omitted).

[30] *Id.* ¶¶ 37-38.

[31] *Id.*

(1) Rhythm didn't validly own its IP, making SPA § 4.16(a) false; (2) Rhythm infringed upon others' IP, making SPA § 4.16(b) false; and (3) Rhythm breached the Murj License Agreements, making SPA § 4.25 false.[32] That's fraud, says Aldrich.

## C. BRAY'S ALLEGED FAILURES TO INDEMNIFY

Plaintiffs[33] also complain that Bray hasn't upheld her indemnity obligations under the SPA. In July 2023, Rhythm sent Bray notice of over $1.5 million in legal fees from the Murj Litigation.[34] When Plaintiffs filed this action in late 2023, their chief indemnity-related grievance was that Bray hadn't released the $500,000 Special Indemnity Escrow Amount.[35] Plaintiffs acknowledge that Bray has since done so, which "mooted this part of Count II."[36]

Plaintiffs, though, also allege that "Bray has further breached the SPA by failing to pay 50% of the losses in the Murj Litigation over $1 million."[37] That part of Count II hasn't gone away. Bray's briefing[38] indicates that she is only willing to

---

[32] *Id.* ¶ 43.

[33] Unlike the fraud claim in Count I, the breach of contract claim in Count II is brought by both Aldrich and Rhythm. *See id.* ¶¶ 52-64.

[34] *Id.* ¶ 50.

[35] *Id.* ¶¶ 49-51.

[36] Pls.' Opp'n at 48 (D.I. 12).

[37] Compl. ¶ 63.

[38] The Court is mindful that "[t]he complaint generally defines the universe of facts that the trial court may consider in ruling on a Rule 12(b)(6) motion to dismiss." *In re Gen. Motors (Hughes)*

pay half of the Murj Litigation expenses over $1.5 million.[39]  So, there is still a $250,000 indemnity dispute.

### D. THIS LITIGATION

This litigation started in October 2023 with a brief stint in Superior Court before it came to the Court of Chancery in December 2023.[40]  Thereafter, Bray promptly moved to dismiss the Complaint.[41]  Plaintiffs opposed the motion,[42] and Bray replied to the opposition.[43]  The Court's now heard argument on the motion.[44]

## II.  LEGAL STANDARD

A motion to dismiss under Court of Chancery Rule 12(b)(6) tasks the Court with weighing the complaint's allegations against the governing "reasonable 'conceivability'" pleading standard.[45]  When applying Rule 12(b)(6), the Court accepts as true all of the complaint's well-pled allegations and draws all reasonable

---

*S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (citations omitted).  The Court relies solely on the parties briefing for their respective positions.

[39]  Bray's Reply at 34 (D.I. 19).

[40]  Compl. ¶ 14 n.1.

[41]  *See* Bray's Mot.

[42]  *See* Pls.' Opp'n.

[43]  *See* Bray's Reply.

[44]  Judicial Action Form (D.I. 25).

[45]  *Sjunde AP-fonden v. Activision Blizzard, Inc.*, 2024 WL 863290, at *3 (Del. Ch. Feb. 29, 2024) (quoting *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011)).

inferences in the plaintiff's favor.[46]   The Court will not, however, accredit "conclusory allegations unsupported by specific facts" nor "draw unreasonable inferences in favor of the nonmoving party."[47]   The Court must "deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[48]

## III.  DISCUSSION

### A.  ALDRICH HAS STATED A CLAIM FOR FRAUD.

To maintain a claim for fraud, a plaintiff must plead facts demonstrating: "(i) a false representation, (ii) the defendant's knowledge of or belief in its falsity or the defendant's reckless indifference to its truth, (iii) the defendant's intention to induce action based on the representation, (iv) reasonable reliance by the plaintiff on the representation, and (v) causally related damages."[49]

Accusations of fraud must also satisfy Rule 9(b)'s particularity requirement, meaning the complaint must describe:  "(1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what

---

[46]  *Id.* (quoting *Cent. Mortg.*, 27 A.3d at 536).

[47]  *Id.* (quoting *Price v. E.I. du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011)).

[48]  *Id.* (quoting *Cent. Mortg.*, 27 A.3d at 536).

[49]  *Malt Fam Tr. v. 777 Partners LLC*, 2023 WL 7476966, at *4, n.31 (Del. Ch. Nov. 13, 2023) (quoting *LVI Grp. Invs., LLC v. NCM Grp. Hldgs., LLC*, 2018 WL 1559936, at *11 (Del. Ch. Mar. 28, 2018)).

the person intended to gain by making the representations."[50]

For now, Bray limits her arguments to fraud's first two elements—the existence of a misrepresentation and Bray's knowledge of it.[51] Bray's contentions miss their mark.

### 1. It's Reasonable to Infer Bray Made False Representations.

Whether it's reasonably conceivable that the challenged representations were false—which is the guiding question at this stage—turns on the impact of the contractual disclosure of the Murj Litigation. If, as Bray would have it, DS § 4.16(b) modifies each challenged representation to account for the Murj Litigation, then the details of the Murj Litigation would not render those representations false. If, on the other hand, the disclosure doesn't apply to the challenged representations, then Aldrich has a conceivable basis for fraud. Accordingly, principles of contractual interpretation are called upon to answer this tort question.

Delaware courts follow the "'objective' theory of contracts," meaning "a contract's construction should be that which would be understood by an objective, reasonable third party."[52] Unambiguous contracts, which are susceptible to only one

---

[50] *Id.* (quoting *ABRY Partners V, L.P. v. F&W Acq. LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006)).

[51] *See* Bray's Mot. at 27-47.

[52] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (citing *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

reasonable interpretation, are enforced as written.[53]  In contrast, a contract that can be reasonably interpreted multiple ways is ambiguous, so extrinsic evidence is needed to determine the parties' intent.[54]  Since the Court does not weigh evidence at the motion to dismiss stage, a defendant can only succeed if its interpretation of the relevant contract "is the only reasonable construction as a matter of law."[55]

Confounding the interpretation of DS § 4.16(b)'s scope is the inconsistency between how the SPA and the Disclose Schedule explain that scope.  SPA § 8.18 provides that each disclosure applies to each representation "to the extent the applicability of such disclosure is readily apparent on its face."[56]  The Disclosure Schedule, in contrast, says a disclosure pertaining to one section of the SPA only applies to other sections of the SPA "if specified under such other section number."[57]  The Court doesn't need to decide between those competing approaches at this stage. Even applying SPA § 8.18—which is Bray's preferred route—it is reasonable to

---

[53]  *Id.* at 1159-60 (citing *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)).

[54]  *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1229 (Del. 1997).

[55]  *Khushaim v. Tullow Inc.*, 2016 WL 3594752, at *3 (Del. Super. Ct. June 27, 2016) (quoting *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996)).

[56]  SPA § 8.18.

[57]  DS at 1.

construe DS § 4.16(b) as not modifying all[58] of the challenged representations.

For starters, the contents of DS §§ 4.16(a) and 4.25 undercut the notion that it is "readily apparent" that DS § 4.16(b) should apply to those representation. DS § 4.16(a) is not merely blank or omitted; instead, it explicitly states, "none."[59] In the Court's view, it is reasonable to interpret "none" to mean that no disclosures apply, implicitly or otherwise. DS § 4.25 leads to a similar conclusion for a dissimilar reason. DS ¶ 4.25 discloses many material contracts, including by cross-referencing other sections of the Disclosure Schedule, but it makes no mention of Murj, the Murj Litigation, or DS § 4.16(b).[60] Under Delaware's contract principles, DS § 4.25's inclusion of explicit cross-references weighs against finding implicit cross-references.[61]

---

[58] Count I alleges that SPA §§ 4.16(a), 4.16(b), and 4.25 were each false. Compl. ¶¶ 25-26, 52-57. If Aldrich has a conceivable claim as to even one of those three representations, the entire Count will survive this stage. *See Cablemaster LLC v. Magnuson Grp. Corp.*, 2023 WL 8678043, at *7 (Del. Super. Ct. Dec. 5, 2023) ("Once the Court determines the claim as a whole is sound, testing the strength of every individual girder is inessential.").

[59] DS § 4.16(a).

[60] *Id.* § 4.25.

[61] *See Malt Fam.*, 2023 WL 7476966, at *7 n. 52 ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court." (quoting *NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007)); *cf. Crispo v. Musk*, 2022 WL 6693660, at *5 n.36 (Del. Ch. Oct. 11, 2022) (noting "the *expressio unius est exclusio alterius* maxim applies in the contractual interpretation context" (citing *Delmarva Health Plan, Inc. v. Aceto*, 750 A.2d 1213, 1216 n.12 (Del. Ch. 1999)))).

Moreover, notwithstanding DS §§ 4.16(a) and 4.25's silence, the Disclosure Schedule explicitly mentions the Murj Litigation outside of DS § 4.16(b). Specifically, DS § 4.18 discloses pending and threatened litigation against Rhythm.[62] Right at the top, it says, "[t]he Murj Litigation."[63]  Either that separate disclosure is superfluous, or DS § 4.16(b)'s scope isn't quite as broad as Bray contends.  The Court declines to hold that an interpretation that defies this state's presumption against meaningless contractual language is unambiguously correct. [64]

Too, the Court notices a distinctive feature of the representations that DS § 4.16(b) unquestionably modifies.  The Disclosure Schedule mentions the Murj Litigation only where the corresponding representation says there is no pending litigation against Rhythm—*i.e.*, representations that are directly refuted by the Murj Litigation's mere existence.  Perhaps, then, SPA § 8.18's "readily apparent" test applies disclosures to each representation that directly conflicts with the disclosure. Under that construction, the challenged representations would not be modified by DS § 4.16(b).

---

[62] DS § 4.18.

[63] *Id.*

[64] *See Malt Fam.*, 2023 WL 7476966, at *7 n. 52; *see also Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023) (Delaware courts "endeavor" to "not render any terms 'meaningless or illusory'" (quoting *Manti Hldgs, LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021))).

The Court does not yet have occasion to decide whether DS § 4.16(b) modifies the challenged representations. For now, it's enough to conclude that Aldrich's position that the challenged representations are unmodified is not unreasonable.[65] And the Court reaches that conclusion.

Bray also argues that Aldrich's interpretation "makes no sense" in light of the Murj-specific indemnity provisions.[66] This argument doesn't require much analysis. It rests on the false premise that indemnifiable litigation expenses are only incurred by losing the litigation. As Count II demonstrates, just defending against litigation costs money. Bray next points at the $22.5 million[67] she says was allocated for indemnifying Murj Litigation costs, saying that sum would not be necessary to defend a meritless claim. But Bray acknowledges that that number is based on the consideration Bray received, not the merits of the Murj Litigation. So, the Court does not view the Murj-specific indemnity provisions as an implicit concession that Rhythm misappropriated Murj's IP or breached the Murj License Agreements.

---

[65] *See Khushaim*, 2016 WL 3594752, at *3.

[66] Bray's Mot. at 32-35.

[67] Bray reaches this number by inputting the $11 million cap on her Murj-related indemnity obligations into her interpretation of SPA § 6.10(g) to calculate the purported maximum total SPA § 6.10(g) contemplates. *See id.* at 34 n.119.

### 2. It's Reasonable to Infer Bray Knew the Representations were False.

Bray's second category of arguments against the fraud claim pertain the purported inconceivability that Bray knew Rhythm had misappropriated IP or violated the Murj License Agreements. None of these arguments clear the high hurdle defendants face at the pleading stage. To adequately plead knowledge, a plaintiff need only allege facts that demonstrate the representation's falsity "was knowable and that the defendants were in a position to know it."[68] Aldrich satisfies both of those requirements.

Starting with the "position to know" prong, the Complaint contains ample allegations to support that Bray was in a position to know about Rhythm ripping off the Murj Platform to build Synergy. The Complaint quotes deposition testimony from a Rhythm employee who described Bray as "very hands-on" and said "[n]othing happened at [Rhythm] without Rhonda Bray knowing about it."[69] And as mentioned, the Complaint alleges that Bray personally took part in conversations about using Murj Platform as a template for Synergy and hiding that use from Murj.[70] In response, Bray resorts to questioning the allegations' credibility and offering

---

[68] *Labyrinth, Inc. v. Urich*, 2024 WL 295996, at *13 (Del. Ch. Jan. 26, 2024) (quoting *ABRY Partners*, 891 A.2d at 1050).

[69] Compl. ¶ 41.

[70] *Id.* ¶¶ 35-39.

competing interpretations of the evidence.[71]  That won't do it on a dismissal motion.[72]

Bray's arguments about whether it was "knowable" that Rhythm misappropriated Murj's IP and thereby breached the Murj License Agreements aren't much stronger.

Bray first posits that because the representations pertained to "legal conclusions," she, a sophisticated businesswoman, could not be expected to know whether they were true or not.  Not so.  For one thing, Bray's citations to the difficulty of predicting the outcome of litigation are inapposite.  The outcome of litigation turns on innumerable subtle variables besides the action's merit.  Was the action timely brought in a suitable forum?  How much evidence has been preserved?  Will the key witness hold up on cross-examination?  Can counsel find parking at the courthouse?[73]  Bray didn't need to know any of those things to know whether Rhythm had misappropriated IP or breached an agreement.  And the Court flatly rejects the notion that businesspeople are categorically ignorant to their own

---

[71]  Bray's Mot. at 39-43.

[72]  *See Activision Blizzard, Inc.*, 2024 WL 863290, at *3.

[73]  *See Acuity Ins. Co. v. Gartner Plumbing & Heating LLC*, 2024 WL 1639802, at *1 (Vt. Super. Ct. Apr. 3, 2024) (denying a motion to vacate judgment after plaintiff's case was dismissed with prejudice because plaintiff's counsel failed to appear for trial because counsel "had trouble finding parking").

contractual adherence until their conduct is tried in court. Contracts only work in the real day-to-day world because—at least most of the time—real day-to-day people know how to follow them.

Bray next says that Rhythm's position in the Murj Litigation—*i.e.*, that Rhythm didn't breach the Murj License Agreements—means there must at least be uncertainty about that fact.[74] This argument prematurely asks the Court to weigh the credibility of Aldrich's averments here against that of Rhythm's averments in federal court. Bray tacitly concedes as much by using Rule 11 of the Federal Rules of Civil Procedure to drape Rhythm's federal pleadings with legitimacy.[75] Moreover, the fact that Rhythm mustered presumably good-faith denials of Murj's allegations doesn't necessarily make it inconceivable that Bray knew the challenged representations were false. Rhythm's contradictory averments in federal court might just exploit insubstantial technicalities. In any event, now's not the time for fact-finding. The Complaint's allegations raise a fair inference that Bray knew Rhythm used the Murj Platform to build Synergy in violation of the Murj License

---

[74] Bray's Mot. at 44-45.

[75] *Id.* at 45; *see* Fed. R. Civ. P. 11(b)(2) ("By presenting to the court a pleading . . . an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: . . . the claims, defenses, and other legal contentions are warranted by existing law[.]").

Agreements.

### B. ALDRICH HAS ADEQUATELY STATED A BREACH-OF-CONTRACT CLAIM.

A separate issue is Bray's compliance with the SPA's indemnity provisions. Large portions of this section of the Complaint have been mooted by post-filing developments—namely, that Bray agreed to release the disputed escrowed funds.[76] Even so, the parties' indemnity impasse has not yet met its end. The Complaint alleges that Bray has not paid her share of the losses that exceed the escrowed amount.[77] And the parties disagree about what Bray's share is.[78] So Count II persists.

Bray's argument against what's left of Count II is uncompelling. It is predicated on the idea that Plaintiffs' claim for indemnity is "skeletal and unripe."[79] But the Complaint asserts that: (1) Plaintiffs "sent Bray an indemnification demand notice attaching evidence that Rhythm had incurred over $1.5 million in legal fees in the Murj Litigation";[80] (2) " under Section 6.10(g), Bray must pay half of all loses

---

[76] *See* Pls.' Opp'n at 48; *supra* Section I.C.

[77] Compl. ¶ 63.

[78] *See* Bray's Reply at 34.

[79] Bray's Mot. at 47. The Court notes that ripeness challenges fall under Rule 12(b)(1)'s ambit. *See Viacom Inc. v. U.S. Specialty Ins. Co.*, 2023 WL 2034445, at *2 (Del. Super. Ct. Feb. 16, 2023).

[80] Compl. ¶ 50.

over $1 million";[81] and (3) "Bray has . . . breached the SPA by failing to pay 50% of the losses in the Murj Litigation over $1 million."[82]  The Court therefore disagrees that it is "impossible for Bray to ascertain what she has supposedly been 'failing to pay'" or that Plaintiffs' claim is somehow unripe.[83]

Bray's reply brief acknowledges Plaintiffs' right to payment but disputes Plaintiffs' interpretation of SPA § 6.10(g).[84]  The disagreement boils down to whether Rhythm's initial obligation under SPA § 6.10(g)(ii) is to shoulder the first $1 million after the Special Indemnity Escrow Amount is exhausted, or only the first $500,000 after the same.[85]  That question relates to the measure of Plaintiffs' damages, not whether Plaintiffs have stated a claim.  And the Court will not rush to answer a question that only Bray's reply brief meaningfully discussed.

---

[81]  *Id.* ¶ 61.

[82]  *Id.* ¶ 63.

[83]  *See* Bray's Mot. at 48.

[84]  Bray's Reply at 33-34.

[85]  *Id.*; *see also* Pl.'s Opp'n at 49 n.20.

## VI. CONCLUSION

Aldrich has stated its claims for both fraud and breach of contract. And notwithstanding some mid-litigation developments, the latter is still a live controversy.

Resultingly, Bray's 12(b)(6) Motion to Dismiss must be **DENIED**.

**IT IS SO ORDERED.**

_____
Paul R. Wallace, Judge

cc: All Counsel via File and Serve